IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 2, 2022

## IN RE C.T.

**Appeal from the Juvenile Court for Sevier County**
**No. 21-000697       Jeffrey D. Rader, Judge**
_____

**No. E2021-01336-COA-R3-PT**
_____

This appeal involves termination of the parental rights of an incarcerated putative father. The trial court found by clear and convincing evidence that grounds for termination existed and that termination was in the best interest of the child. We affirm and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which W. NEAL MCBRAYER and KRISTI M. DAVIS, JJ., joined.

Gregory E. Bennett, Seymour, Tennessee, for the appellant, Brandon W.

Herbert H. Slatery, III, Attorney General and Reporter, and Jordan K. Crews, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I.   FACTS & PROCEDURAL HISTORY

The female child at issue in these proceedings, C.T., was born in 2007.[1] No father was listed on the child's birth certificate. At some point, C.T. was placed in the legal custody of another individual, Ms. L, who apparently has custody of C.T.'s half-brother as well. However, for reasons that are not explained in the record, C.T. later went to live in the home of Mr. and Mrs. S. Thus, Mr. and Mrs. S had physical custody of C.T. while Ms. L maintained legal custody.

---

[1] We use initials and abbreviated names to protect the privacy of the child in this case.

In November 2019, when C.T. was twelve years old, the Tennessee Department of Children's Services filed a petition for temporary legal custody of her. The respondents were listed as C.T.'s mother (address unknown), C.T.'s current physical custodian Mrs. S, and her legal custodian Ms. L, but the petition stated that the child's father was unknown. According to the petition, C.T. had been removed from her mother in 2008 due to substance abuse issues and placed in the custody of Ms. L, but in 2017, DCS became aware that the child had been residing in the home of Mr. and Mrs. S for several years. The petition recounted numerous allegations regarding physical altercations and concerns about sexual abuse in the home of Mr. and Mrs. S. As such, the petition asked the juvenile court to declare the child dependent and neglected and award temporary custody to DCS. The juvenile court entered a protective custody order that same day placing the child in the temporary legal custody of DCS. However, the record does not contain any additional documents from the dependency and neglect proceeding, and it is not clear how or when it was resolved.

DCS foster care worker Candy Kirk was assigned to C.T.'s case when she came into custody in November 2019 after removal from the home of Mr. and Mrs. S. Ms. Kirk did not have any contact information for the child's mother and tried unsuccessfully to locate her through various searches. C.T. was ultimately returned to the home of Ms. L, her former legal custodian, where her half-brother resided. However, Ms. L had not spoken with C.T.'s mother in several years. In early 2021, C.T.'s mother contacted Ms. L and revealed her location, and Ms. L in turn told DCS that C.T.'s mother was incarcerated in a certain prison. Ms. Kirk went to the prison to speak with the mother. C.T.'s mother did not immediately identify any potential father of C.T. However, she ultimately surrendered her parental rights and, during that process in March 2021, identified Brandon W. as C.T.'s father. She told Ms. Kirk that Brandon was incarcerated but that he knew that he was the father of C.T.

Ms. Kirk encountered some difficulty locating the correct prison but ultimately made contact with Brandon in May 2021. He indicated that he knew about C.T. and said he had heard that she had special needs. He declined to surrender his parental rights. According to Ms. Kirk, Brandon said to her, "I can use her as a reason for compassionate release to get out of prison."

Almost immediately thereafter, on June 8, 2021, DCS filed a petition to terminate Brandon's parental rights to C.T. The petition stated that C.T.'s mother had previously surrendered her rights and so her rights were not addressed in the petition, and she was not named as a party. The petition asserted that numerous grounds for termination existed under Tennessee Code Annotated section 36-1-113(g)(9), which applies to putative fathers, as Brandon was not a legal parent of C.T. Specifically, it asserted that he had not filed a petition to establish paternity of the child; that he had failed to seek visitation or make reasonable payments for her support; that he had failed to manifest a willingness and ability

to parent her; and that placing the child in his custody would pose a risk of substantial harm to her welfare. The petition also asserted that termination was in the best interest of C.T. As such, it asked the court to award complete guardianship to DCS.

The juvenile court appointed a guardian ad litem and appointed counsel for Brandon. The termination trial was held on October 27, 2021, with Brandon participating by telephone from a federal penitentiary in West Virginia. C.T. was fourteen years old at the time of trial. Brandon testified that he knew C.T. was his child and that he had known about her since her mother became pregnant. He said he and the child's mother remained together throughout the pregnancy, but that he was not present for the child's birth in early 2007 because he was "on the run from law enforcement at the time." Still, Brandon said he "spent time with her" soon after her birth. He stated that he was using marijuana and alcohol during this time period and "wasn't living right." He said the reason he was on the run from law enforcement was because he had been on "intense probation" in connection with a charge from the State of Tennessee for possession of cocaine with intent to distribute, and yet he had smoked marijuana. Brandon said he knew that he would fail the drug test and decided that since he had a daughter on the way, it would be better "to just run rather than to be arrested." He said that a violation of his probation meant that he would have to serve more of his sentence, which was roughly three more years, before he would be eligible for parole.

Brandon testified that "the police finally caught up with [him]" in December 2008 (when C.T. was about 20 months old). He had a gun at the time, so he was arrested and federally charged with being a felon in possession of a firearm. He remained incarcerated for three years, from December 2008 until September 2012, then he resided at a federal halfway house until February 2013.

Brandon testified that he was released in February 2013 (when C.T. was five) but that things did not go well for him in an unstable environment. However, he remained out of prison for over two years and worked steadily during that time, finishing concrete, working at a lawn service "on the side," and also working for a remodeling company. He testified that he was arrested again in August 2015 for violating his probation and charged with possessing ammunition. He was still serving his sentences for those offenses in the federal penitentiary at the time of trial in 2021.

Brandon was asked if he had any contact with C.T. during the period of two and a half years when he was not incarcerated, from February 2013 until August 2015. He said he had wanted to take custody of C.T., so at "the end of 2013" he tried to reach out to the child's physical custodian through the child's aunt, because the child's mother was either living out of state or incarcerated. He said the aunt contacted the custodian but then relayed to him that the custodian did not want "anything to do with [him]." He said he "tried a few more times" and talked with the aunt but did not know the custodian's phone number or location. Brandon said the child's aunt may have mentioned the custodian's name to him

but that he could not remember, as he was "drinking a lot."

Brandon admitted that he last had contact with C.T. when she was in "early infancy." Candidly, he added, "Since then I've been in prison nearly eleven years of her fourteen-year-old – her fourteen-year life." He testified that he never attempted to legitimate C.T. because he was not aware that it needed to be done. He said he "probably would have" gone to court if he had only known that he needed to do so, but "whenever it comes to legal stuff, . . . [he was] not up to par." He also said that he knew C.T. was safe and he could not afford a lawyer. When asked if he had ever paid any child support, Brandon said he had given money to the child's mother, and he also gave some money to the child's aunt during his period of non-incarceration, but he last did so in 2014.

Brandon was asked what he knew about the child's current needs and said he was only aware that she "suffers from some issues." His expected release date was in 2025, three years after trial. He said if he was released at that point, he would like to find C.T. and "make amends" and "get to know her." He said he regretted that the child was in this situation due to the choices made by him and her mother. He said if her conditions required lifelong care then he hoped he would be able to provide it for her. Brandon said he had applied for "compassionate release" not for himself but for C.T., so that he could "be there for her." He said that if his request for compassionate release was granted, he would "[i]nstantly" be able to care for C.T. by living with his aunt and working in the job he maintained during his last period of non-incarceration. He estimated that he could obtain a vehicle and residence in three months with federal stimulus money he expected to receive.

Ms. Kirk also testified. She described how C.T. was removed from her physical custodians, who had no contact information for the child's mother and provided no information regarding a possible father. Ms. Kirk said that C.T. had never talked about Brandon or even mentioned her father. She described the child's special needs. She said C.T. has been diagnosed with schizoaffective disorder of the bipolar type, post-traumatic stress disorder, attention deficit hyperactivity disorder, and suicidal ideations with non-interest behavior. At the time of trial, C.T. had been removed from the home of Ms. L and placed in an "adolescent care facility" for treatment due to disturbing behavior. It was still possible that she might be able to return to the home of Ms. L with her half-brother, which was a pre-adoptive home. However, there were discussions about whether Ms. L would have to undergo additional training first to become a therapeutic foster home. Those treating C.T. at the facility did not believe she could function in a foster home environment as of yet. Even in a therapeutic foster home, she would need weekly therapy, medication management, and ongoing psychiatric treatment.

The trial court entered its final written order on November 1, 2021. At the outset, the order states that C.T.'s mother had previously surrendered her rights to the child and that she had been addressed by separate order. For reasons that will be discussed hereinafter, the trial court found that grounds for termination of Brandon's parental rights

- 4 -

existed under Tennessee Code Annotated section 36-1-113(g)(9). It also found that termination of parental rights was in the best interest of C.T. Thus, the juvenile court awarded full guardianship of the child to DCS with the right to place her for adoption. The order was certified as final and immediately appealable pursuant to Tennessee Rule of Civil Procedure 54.02. Brandon filed a notice of appeal to this Court.

## II. ISSUES PRESENTED

Brandon presents the following issues for review on appeal:

1. Did the trial court err in ruling that the order titled "Termination of Parental Rights and Decree of Full Guardianship" constituted an appealable, final judgment as defined by Tennessee Rule of Civil Procedure 54.02?

2. Did the trial court err in finding by clear and convincing evidence that Brandon had failed to establish paternity pursuant to Tennessee Code Annotated section 36-1-113(g)(9) and Section 36-1-117(c)?

3. Did the trial court err in finding by clear and convincing evidence that termination of parental rights was in the best interest of the child as defined by Tennessee Code Annotated section 36-1-113(i)?

For the following reasons, we affirm the decision of the juvenile court and remand for further proceedings.

## III. STANDARDS APPLICABLE TO TERMINATION PROCEEDINGS

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Pursuant to the statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, that party must prove the existence of at least one of the statutory grounds for termination set forth in Tennessee Code Annotated section 36-1-113(g). *Id.* The grounds are "cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground." Tenn. Code Ann. § 36-1-113(g). Second, the petitioner must prove that termination of parental rights is in the best interest of the child, considering the best interest factors listed in Tennessee Code Annotated section 36-1-113(i). *In re Kaliyah S.*, 455 S.W.3d at 552.

Because of the constitutional dimension of the parent's rights at stake, the party seeking termination "must prove all the elements of their case by clear and convincing evidence." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). To be clear and convincing, the evidence must enable the finder of fact "to form a firm belief or conviction

regarding the truth of the facts" sought to be established and eliminate "any serious or substantial doubt about the correctness" of the findings. *Id.*

Due to this heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). Appellate courts review the trial court's factual findings de novo in accordance with Tennessee Rule of Appellate Procedure 13(d), presuming each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016). Then, we make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. DISCUSSION

### A. *Rule 54.02*

Before we turn to the merits of this appeal, we must address Brandon's first issue regarding whether the trial court's order was a final and appealable judgment as defined by Tennessee Rule of Civil Procedure 54.02. Although Brandon is the appellant in this matter, he argues that this Court lacks subject matter jurisdiction over his appeal.[2] His argument appears to be twofold: (1) the order was certified as final under Rule 54.02 without any "specific findings of facts" to support the conclusion that there was no just reason for delay; and (2) the termination order "did not address the [m]other's surrender."

Neither argument convinces this Court that it lacks subject matter jurisdiction. As a matter of finality, there was no need for the trial court's termination order to further "address the [m]other's surrender." She has never been a party to this case. The petition to terminate Brandon's parental rights stated that the mother had previously surrendered her rights and therefore she would not be addressed in the petition. She did not participate in the case, although Ms. Kirk mentioned the mother's surrender during her testimony.

---

[2] We considered a similar situation in *Byrnes v. Byrnes*, 390 S.W.3d 269, 276 (Tenn. Ct. App. 2012):

> Wife, in her role as *appellant* in this case, strangely enough argues that the order from which she appeals, *i.e.*, the December 2010 order, is not a final order. If she is correct, the result would be that we would lack subject matter jurisdiction over this appeal and Wife would find herself in the troublesome position of having appealed a non-final order as if it were a final order.

Counsel for DCS reminded the court that the mother "is not a part of this petition because she has previously surrendered her rights" and the child was already "in partial guardianship." Finally, the final order states that the mother had previously surrendered her rights and that the matter was addressed separately. Because the child's mother was not a party to this termination proceeding, any issue regarding her does not prevent the termination order from being final and appealable. Thus, it appears to this Court that it was not even necessary for the trial court to certify its order as final under Rule 54.02. We note that Rule 54.02 serves as "an exception to Rule 3 that permits the trial court, without permission from the appellate court, to certify an order as final and appealable, even if parts of the overall litigation remain pending in the trial court." *Johnson v. Nunis*, 383 S.W.3d 122, 130 (Tenn. Ct. App. 2012). Here, however, the trial court resolved all issues regarding the termination of Brandon's parental rights and awarded full guardianship to DCS. For purposes of Rule 54.02, a "'final judgment' refers to a trial court's decision adjudicating all the claims, rights, and liabilities of all the parties." *Discover Bank v. Morgan*, 363 S.W.3d 479, 488 n.17 (Tenn. 2012). A final judgment resolves all issues and leaves "'nothing else for the trial court to do.'" *In re Estate of Henderson*, 121 S.W.3d 643, 645 (Tenn. 2003) (quoting *State ex rel. McAllister v. Goode*, 968 S.W.2d 834, 840 (Tenn. Ct. App. 1997)). Thus, it is not clear why the juvenile court certified its order as final and appealable under Rule 54.02. DCS suggests in its brief that certification was "not necessary here." We agree. The trial court's certification under Rule 54.02 was unnecessary, and Brandon's arguments regarding finality under Rule 54.02 are misplaced. *See, e.g.*, *S.A.M.D. v. J.P.D.*, No. W2011-01256-COA-R3-CV, 2012 WL 5266194, at *9 n.10 (Tenn. Ct. App. Oct. 25, 2012) (noting that the trial court apparently certified its order as final and appealable pursuant to Rule 54.02 "out of an abundance of caution" but that "such certification was unnecessary").

## B.    *Grounds for Termination*

The trial court found that grounds for termination existed pursuant to Tennessee Code Annotated section 36-1-113(g)(9), which, at the time of filing of the termination petition, provided, in pertinent part:

> (9)(A) The parental rights of any person who, at the time of the filing of a petition to terminate the parental rights of such person . . . is the putative father of the child may also be terminated based upon any one (1) or more of the following additional grounds:
>
> (i) Deleted by 2019 Pub.Acts, c. 36, § 3, eff. July 1, 2019.
> (ii) The person has failed, without good cause or excuse, to make reasonable and consistent payments for the support of the child in accordance with the child support guidelines promulgated by the department pursuant to § 36-5-101;
> (iii) The person has failed to seek reasonable visitation with the child, and if

- 7 -

visitation has been granted, has failed to visit altogether, or has engaged in only token visitation, as defined in § 36-1-102;

(iv) The person has failed to manifest an ability and willingness to assume legal and physical custody of the child;

(v) Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; or

(vi) The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(3)[.]

Tenn. Code Ann. § 36-1-113(g)(9).

"Putative father" means a biological or alleged biological father of a child who, at the time of the filing of the petition to terminate the parental rights of such person . . . meets at least one (1) of the criteria set out in § 36-1-117(c), has not been excluded by DNA testing as described in § 24-7-112 establishing that he is not the child's biological father or that another man is the child's biological father, and is not a legal parent[.]

Tenn. Code Ann. § 36-1-102(44). One of the criteria in section 36-1-117(c) applies here, as Brandon,

has claimed to the child's biological mother, or to the petitioners or their attorney, or to the department, a licensed child-placing agency, or a licensed clinical social worker who or that is involved in the care, placement, supervision, or study of the child that the biological father believes that the biological father is the father of the child[.]

Tenn. Code Ann. § 36-1-117(c)(2). We also note that Brandon was not a "legal parent" within the meaning of Tennessee Code Annotated section 36-1-102(29).[3] Thus, ground

---

[3] Tennessee Code Annotated section 36-1-102(29)(A) defines a legal parent as:

(i) The biological mother of a child;
(ii) A man who is or has been married to the biological mother of the child if the child was born during the marriage or within three hundred (300) days after the marriage was terminated for any reason, or if the child was born after a decree of separation was entered by a court;
(iii) A man who attempted to marry the biological mother of the child before the child's birth by a marriage apparently in compliance with the law, even if the marriage is declared invalid, if the child was born during the attempted marriage or within three hundred (300) days after the termination of the attempted marriage for any reason;
(iv) A man who has been adjudicated to be the legal father of the child by any court or

(g)(9) is applicable to Brandon as a putative father. The trial court found that Brandon "was not a legal parent at the time this Petition was filed" and "there is no legitimate reason why he has never filed to become the legal parent of the child or why he would not have been able to [do so]," as he "admitted that he has known the child was his since the mother was pregnant with the child."

On appeal, Brandon does not dispute that he met the definition of a putative father. However, his precise argument regarding this ground is somewhat difficult to follow. First, he argues that "[i]n considering whether [he] had failed to establish paternity, the trial court failed to look at those factors that go beyond mere appearance and fill in documents." He suggests that the trial court should have considered that he spent time with his infant daughter before going to prison, made attempts to contact her through a family member when he was released, "held himself out as [C.T.'s] Father throughout the hearing," and could begin caring for her if he was granted compassionate release. Respectfully, these facts do not alter our conclusion that Brandon failed to establish paternity and was a mere putative father as defined by the relevant statute. We also note that, surprisingly enough, this Court has considered and rejected this exact argument before. In *In re Adaline D.*, No. E2020-01597-COA-R3-PT, 2021 WL 5297683, at *11 (Tenn. Ct. App. Nov. 15, 2021), we considered whether an appellant was a putative father within the meaning of subsection (g)(9) and the relevant definitions, but then stated:

> The gist of Tyson's argument on appeal is that the trial court "failed to look at those factors that go beyond mere appearance and fill in documents." In essence, he asserts—without citation to legal authority—that the trial court should have disregarded the statutory requirements established by the legislature for establishing paternity and, instead, deemed sufficient the fact that the parties did not dispute that he held himself out as Lilah's father. We disagree. Courts are not at liberty to disregard the clear mandates of a statute. *See Ken Smith Auto Parts v. Thomas*, No. E2018-00928-COA-R3-CV, 2019 WL 192442, at *6 (Tenn. Ct. App. Jan. 15, 2019) (quoting *Browning v. Browning*, No. E2017-02354-COA-R3-CV, 2018 WL 4057245, at *3 n.3 (Tenn. Ct. App. Aug. 27, 2018)). We thus find no error in the trial court's conclusion that Tyson failed to establish paternity of Lilah and, therefore, is not her legal father.

We likewise reject the argument here.[4]

---

administrative body of this state or any other state or territory or foreign country or who has signed, pursuant to § 24-7-113, § 68-3-203(g), § 68-3-302, or § 68-3-305(b), an unrevoked and sworn acknowledgment of paternity under Tennessee law, or who has signed such a sworn acknowledgment pursuant to the law of any other state, territory, or foreign country; or

(v) An adoptive parent of a child or adult[.]

[4] Brandon's counsel also represented the putative father in *In re Adaline D.*

Next, Brandon relies on Tennessee Code Annotated section 36-2-305, which is part of the chapter of the Tennessee Code that "provides a single cause of action to establish parentage of children other than establishment by adoption pursuant to chapter 1 of this title, or by acknowledgement of parentage pursuant to § 68-3-203(g), § 68-3-302 or § 68-3-305(b)." Tenn. Code Ann. § 36-2-301. Section 305, which Brandon cites, states, "The court may enter an order of parentage upon the agreement of the mother and father unless the court on its own motion orders genetic testing. In any such agreement, the mother and father must affirmatively acknowledge their parentage of the child. Any agreement under this part shall comply with the requirements of § 36-2-311." Tenn. Code Ann. § 36-2-305(a). Brandon argues that "[i]n this case, both parents have acknowledged that [Brandon] is [C.T.'s] Father," and so this acknowledgement "gave the Juvenile Court a sufficient evidentiary foundation to have granted the Father an order of parentage thereby satisfying the requirements of 36-1-113(g)(9)(A)(vi)." This argument must fail as well. First, we note that this is not an action to establish parentage under Title 36, Chapter 2, nor did Brandon even seek a determination of parentage in the lower court. The statute that does apply here, Tennessee Code Annotated section 36-1-113(g)(9), requires a determination of whether the individual was a putative father "at the time of the filing of a petition to terminate the parental rights of such person[.]" *See In re D.A.H.*, 142 S.W.3d 267, 272-73 (Tenn. 2004) (recognizing that the statute provides "authority to apply the additional grounds for termination enumerated in section 36-1-113(g)(9)(A) to persons who have established legal parentage, but did so subsequently to the filing of a petition seeking termination of their parental rights"); *In re F.N.M.*, No. M2015-00519-COA-R3-PT, 2016 WL 3126077, at *8 (Tenn. Ct. App. Apr. 11, 2016) (finding the grounds in (g)(9) applicable even though the putative father filed an emergency petition to establish paternity after the petition for termination was filed); *In re Adoption of D.B.S.M.*, No. E2007-02663-COA-R3-PT, 2008 WL 2502118, at *7 (Tenn. Ct. App. June 23, 2008) (finding ground (g)(9) applicable where the father "took no steps to establish his legal parentage of the Child until after the filing of the Petition"). Thus, we find no support for Brandon's curious argument that the trial court should have sua sponte granted him an order of parentage in this termination action in an effort to "satisfy[] the requirements" of this ground.

Finally, we note that the trial court found each of the enumerated subsections of ground (g)(9) applicable in this case. Although Brandon does not challenge those findings on appeal, we will review them nonetheless. The trial court found that he failed to establish paternity despite knowing the child was his since the mother was pregnant. *See* Tenn. Code Ann. § 36-1-113(g)(9)(A)(vi) ("The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(3)."). It found that he had not sought reasonable visitation with the child or even seen her since she was an infant. *See* Tenn. Code Ann. § 36-1-113(g)(9)(A)(iii) ("The person has failed to seek reasonable visitation with the child, and if visitation has been granted, has failed to visit

altogether, or has engaged in only token visitation, as defined in § 36-1-102."). It found that he had no good cause or excuse for his failure to make reasonable and consistent payments of child support and had not sent any money for her care since at least 2014, if ever. *See* Tenn. Code Ann. § 36-1-113(g)(9)(A)(ii) ("The person has failed, without good cause or excuse, to make reasonable and consistent payments for the support of the child in accordance with the child support guidelines promulgated by the department pursuant to § 36-5-101."). The court found "no indication that [he] is willing or has the ability to take custody of the child" other than his statement to that effect in court. *See* Tenn. Code Ann. § 36-1-113(g)(9)(A)(iv) ("The person has failed to manifest an ability and willingness to assume legal and physical custody of the child."). The court also found that placing C.T. in Brandon's custody would pose a risk of substantial harm to the child's welfare, as the child has special needs, is currently in residential treatment and will need ongoing treatment, and has a chance at permanence in a foster home with her half-sibling once she is ready for it. *See* Tenn. Code Ann. § 36-1-113(g)(9)(A)(v) ("Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child."). The court found that the foster home offered a better chance at stability than any home Brandon might be able to provide should he be released from incarceration in four years. The court did not believe that C.T. could be placed with Brandon "anytime in the near future." The record clearly and convincingly supports each of the trial court's findings and conclusions as to these grounds.

### C. Best Interest

"Effective April 22, 2021, the General Assembly [] amended Tennessee Code Annotated § 36-1-113(i) by deleting the previous subsection in its entirety and substituting a new subsection providing, inter alia, twenty factors to be considered in determining a child's best interest in a case involving termination of parental rights." *In re Caroline R.*, No. E2021-00245-COA-R3-PT, 2022 WL 702392, at *12 n.7 (Tenn. Ct. App. Mar. 9, 2022) (citing 2021 Tenn. Pub. Acts, Ch. 190 § 1 (S.B. 205)). Thus, "the amended statute applies only to petitions for termination filed on or after April 22, 2021." *In re Riley S.*, No. M2020-01602-COA-R3-PT, 2022 WL 128482, at *14 n.10 (Tenn. Ct. App. Jan. 14, 2022) *perm. app. denied* (Tenn. Mar. 17, 2022). The petition in this case was filed on June 8, 2021, so the new factors were correctly applied by the trial court.

According to one author, "[m]edical and psychological understanding of attachment, trauma and child development ha[d] advanced rapidly since the 1970s when Tennessee's best interest factors came into being," and the new factors were "designed to bridge the knowledge gap and operationalize a modern understanding of child development, attachment and trauma." Dawn Coppock, *Happier Childhoods and Better Best Interest Factors*, 57 Tenn. B.J. 24, 25 (July/Aug. 2021). This Court has observed that the old factors "are included in the new version of factors that went into effect in April 2021." *In re Da'Moni J.*, No. E2021-00477-COA-R3-PT, 2022 WL 214712, at *23 (Tenn. Ct. App. Jan. 25, 2022) *perm. app. denied* (Tenn. Apr. 1, 2022). However, the statute as

amended "now includes additional factors that should be considered, if relevant." *In re Riley S.*, 2022 WL 128482, at \*14 n.10; *see also Coppock*, 57 Tenn. B.J. at 26 (stating that courts are not "required to make findings for each enumerated factor, but are directed to identify the factors relevant to the case at bar, including any other 'child-centered factors' and to make specific findings of fact regarding only the factors considered").

Although several cases have recognized the adoption of the new factors, it appears that this may be the first case in which the new factors have actually been applied on appeal. The statute, as amended, provides:

> (i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:
> (A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
> (B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;
> (C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;
> (D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;
> (E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;
> (F) Whether the child is fearful of living in the parent's home;
> (G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;
> (H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;
> (I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;
> (J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable

- 12 -

manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4) Expert testimony is not required to prove or disprove any factor by any party.

Tenn. Code Ann. § 36-1-113(i). "In all cases, when the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child." Tenn. Code Ann. § 36-1-101(d).

In its best interest analysis, the trial court stated that "one of the biggest factors in this case" was that Brandon had been incarcerated "for the better part of 11 years," but even "more importantly," the court found, "there was no relationship with this child prior to his incarceration when he knew about the child." The trial court found that there was "no bond whatsoever between [Brandon] and this child." Tracking the language of the factors, it found that C.T. has a "critical need for stability and continuity of placement" throughout minority, especially considering her emotional and psychological needs. *See* Tenn. Code Ann. § 36-1-113(i)(1)(A). The trial court was hopeful that she could be placed in a home where she was comfortable and enjoyed a stable relationship with the foster parent and found that a change in her caretaker and physical environment would likely have a negative effect on her emotional, psychological, and/or medical condition. *See* Tenn. Code Ann. § 36-1-113(i)(1)(B). It further found that placing C.T. with Brandon "would be detrimental to the child because she does not know him." The court found that Brandon had failed to demonstrate "continuity and stability in meeting the child's basic material, educational, housing, and safety needs," as he "ha[d] not been involved in her life since she was an infant." *See* Tenn. Code Ann. § 36-1-113(i)(1)(C). The court found no healthy and secure parental attachment between Brandon and C.T. and no reasonable expectation that Brandon could create one. *See* Tenn. Code Ann. § 36-1-113(i)(1)(D). Again, the court noted that he had not seen the child since she was an infant and had no relationship with her. The court found that Brandon failed to maintain visitation or other contact with the child or use visitation or contact to cultivate a positive relationship with her. *See* Tenn. Code Ann. § 36-1-113(i)(1)(E). It found that C.T. did not know Brandon or his family, so there was no emotionally significant relationship with him or his family that would be impacted by termination of parental rights. *See* Tenn. Code Ann. § 36-1-113(i)(1)(I). The court found that even when he was out of prison for a few years, he did not file a petition to establish paternity or seek visitation. *See* Tenn. Code Ann. § 36-1-113(i)(1)(M). Also, it found that Brandon showed neglect toward C.T. by not seeking contact or any relationship with her when she was very young or during the time when he was not incarcerated. *See* Tenn. Code Ann. § 36-1-113(i)(1)(N). It noted that he had never provided "safe and stable care" for her in the past, as she had never been in his care or custody. *See* Tenn. Code Ann. § 36-1-113(i)(1)(O). Regarding the "physical environment" of his home, the court noted that Brandon resides in a federal penitentiary. *See* Tenn. Code Ann. § 36-1-113(i)(1)(R). Finally, the court noted that Brandon failed to consistently provide support or provided only token support to the child, giving money to the mother or another family member a handful of times. *See* Tenn. Code Ann. § 36-1-113(i)(1)(S). In closing, the court found there was "no possibility of placement with [Brandon] at this time" and no suggestion that such would change anytime in the near future. It found no indication that a compassionate release was even remotely possible. Considering all these factors, the court found by clear and convincing evidence that it was in the best interest of C.T. to terminate Brandon's parental rights.

Having carefully reviewed the trial court's best interest analysis, we conclude that the proof does not preponderate against the trial court's factual findings, and we conclude

that the facts, viewed as a whole, amount to clear and convincing evidence that termination of parental rights is in the best interest of C.T.[5] *See In re Neveah M.*, 614 S.W.3d 659, 680 (Tenn. 2020). Brandon insists on appeal that terminating his parental rights would serve no purpose and "simply eliminates one individual who may at some time be a beneficial influence for the Child." We recognize that the best interest inquiry "should address itself to the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re Aiden R.*, No. E2015-01799-COA-R3-PT, 2016 WL 3564313, at *10 (Tenn. Ct. App. June 23, 2016). The "[b]est interest factors are to guide the court, after determination of parental unfitness, in determining if the child is better off with or without the parental relationship." Coppock, 57 Tenn. B.J. at 25. Still, considering the best interest of C.T., *from her perspective*, it is clear that termination of parental rights is in her best interest. Brandon is already a complete stranger to C.T., and, sadly, he has not demonstrated that he can serve as a beneficial influence in her life.

## IV.  CONCLUSION

For the aforementioned reasons, the decision of the juvenile court is affirmed and remanded. Costs of this appeal are taxed to the appellant, Brandon W., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE

---

[5] The trial court mentioned one other factor, but DCS states on appeal that there was so little evidence presented regarding that factor that it should have been neutral. Regardless of whether the additional factor weighed in favor of termination or was neutral, the evidence is still clear and convincing that termination was in the best interest of the child.